### In re WILSON.

(District Court, W. D. Arkansas, Ft. Smith Division. June 9, 1902.)

1. BANKRUPTCY—CONTEMPT—REFUSAL OF BANKRUPT TO SURRENDER PROPERTY AND BOOKS OF ACCOUNT.

   A bankrupt, for whose estate a receiver was appointed by the bankruptcy court, on the filing of an involuntary petition against him, neglected and refused to turn over to the receiver his books of account, or notes and mortgages owned by him, but concealed the same. He also disregarded an order of the court commanding him to appear and show cause why he should not be punished for contempt for so doing, leaving

¶ 1. See Bankruptcy, vol. 6, Cent. Dig. § 166.

the state after the order was served upon him. After his return, upon his subsequent examinations he still failed to produce or satisfactorily account for the most important of his books, or to give any satisfactory account of the condition of his business. *Held,* that he was guilty of contempt.

2. SAME—ORDER REQUIRING BANKRUPT TO PAY OVER MONEY—ENFORCEMENT.
A court of bankruptcy has power to order a bankrupt to turn over to his trustee money in his possession or under his control which constitutes a part of his estate, but was not scheduled by him, and to enforce obedience to such order by commitment for contempt in case it is not obeyed; and it is the court's duty to exercise such power where there is sufficient evidence, taking into consideration the money shown to have come into his hands shortly before the bankruptcy, and his failure to account for the same after full opportunity has been given him to do so, to satisfy the judge that the bankrupt has the money in his possession or control, and conceals the same with intent to defraud his creditors.

In Bankruptcy. On proceedings against bankrupt for contempt, and on motion by creditors for an order requiring him to turn over money to his trustee.

Rose, Hemingway & Rose, J. M. Moore, and W. R. Smith, for petitioning creditors.

Geo. S. Cunningham and W. D. Jackoway, for the bankrupt.

ROGERS, District Judge. On the 29th of November, 1901, certain creditors of Henry L. Wilson filed a petition in involuntary bankruptcy against him in this court. On the same day the same creditors filed a petition before the referee in bankruptcy (the district judge being then absent, holding court in St. Louis, Mo.), and in said petition alleged that the bankrupt had been conducting a general credit business, taking mortgages on crops and stocks of customers as security; that large amounts were outstanding and due him on account of advances so made; that his customers were gathering and marketing their crops, and that, unless action was immediately taken to collect such accounts, they would be totally lost; that the bankrupt was also the owner of farms upon which rents were accruing, and which would be lost if attention was not immediately had; that said bankrupt had his store open, and was selling his goods from day to day, and that he was insolvent; and that it was important to the creditors that said money should be impounded for their benefit. The referee in bankruptcy appointed a receiver, it appearing in the order that notice of the application was waived by the counsel for the bankrupt, and that they did not desire to resist the appointment. By the terms of the order, the receiver was to have full power to administer the estate, under the orders and directions of the court, and was appointed receiver of all the property (real, personal, and mixed) of the bankrupt, and to take charge of all the property of every character belonging to the bankrupt; to make an inventory thereof, and file the same with the referee and clerk of the court; to realize as rapidly as possible on the notes and accounts, choses in action, and securities, and in making collections; to buy and sell cotton, compromise claims, and to do and perform such other acts as, in his judgment, might yield

the best results to the estate; and to take all necessary steps to preserve its property. This order was made without objection, and the receiver selected was appointed without objection. On the same day the appointment was made, bond was given, and he entered upon the discharge of his duties. On December 6th the petitioning creditors presented their petition to the district judge, in which they represented that the receiver previously appointed by the referee, after having duly qualified, took possession of the storehouse and stock of goods of the bankrupt, including his safe; that when the safe was opened it was found that the bankrupt had abstracted therefrom all his books of accounts, together with all his notes and mortgages, and refused to turn them over to the receiver, and, with the assistance of his former clerks, was collecting the notes, mortgages, and accounts, and putting the money so collected into his own pocket; that he had purchased and collected on account during the fall season a large number of bales of cotton, which he had sold, and appropriated the proceeds thereof to his own use. They prayed for an order requiring the bankrupt and his clerks to appear before the court and submit to an examination touching the disposition of such notes and books and mortgages, and the moneys that said bankrupt had received as before stated, and to require him to turn over the same, without delay, to the receiver. Upon this petition the court entered an order commanding the said bankrupt to appear in court at 10 o'clock in the forenoon of Monday, December 9, 1901, to show cause why he should not be punished for contempt in refusing to turn over to the receiver his books of account, notes, mortgages, and other property, personal and real, which may have belonged to him upon the filing of the petition in bankruptcy against him. This order was served on the bankrupt at his residence in said district on the 6th of December. The bankrupt disregarded this order, and on the 9th of December the court issued an order that he be attached for his contempt, and brought before the court to answer for disobeying the order theretofore issued. The writ of attachment was never served, for the reason, as shown by the marshal's return, that the bankrupt had left the state. He subsequently returned to his home at Ola, in Yell county, Ark., and from there went to Hot Springs, Ark., to take the Keeley cure. On this being ascertained, by an arrangement between his counsel and the counsel for the petitioning creditors he was permitted to remain there; and they agreed upon a day on which he should appear before the court to answer for his contempt, and to submit to such examination of his affairs as the court might direct. In pursuance of this arrangement, on the 20th of February, 1902, the bankrupt appeared, and by consent of parties the contempt proceeding and his examination as to the condition of his estate were heard together before the court. It developed upon the examination of the bankrupt that during the months of October and November, 1901, the bankrupt had been drinking and debauching to great excess, and that about the 20th of November (eight or nine days before the petition in bankruptcy was filed against him) he left his home, taking with him about $1,000 in money; stating to his clerks

that he was going to try to get means to tide him over his business difficulties. On examination, however, he testified that he started to Texas to meet the traveling agent of one of his creditors, to see what arrangements he could make with him to aid him in his business troubles; that after he started he got drunk, and turned up in Oklahoma, where he remained drunk and gambled until he had squandered the greater portion of the $1,000. He gives no account, however, as to who he gambled with, or how much he lost, or how much he had upon his return. The court is of opinion that this explanation is a mere subterfuge and afterthought, and wholly without any foundation in truth. It is not supported by any evidence, and is neither reasonable nor plausible. The bankrupt had counsel at Ola, where his business was located, and was in communication with his clerks; and it appears that the clerk in charge caused to be turned over to his wife all the money turned in after he left, except some small amounts paid to customers, and $70, which he caused said clerk to bring to him in the territory. It also turns out that upon his return to the state, and upon service being had upon him to appear and show cause, as hereinbefore stated, why he should not be punished for contempt in refusing to turn over his books and papers, again he left the state and went to the Indian Territory. It also appears that a few days later he returned to the state, and, on his return, directed his clerks to enter upon his books, which were then concealed at his residence (their whereabouts not being known either to his clerks or to his attorneys), such credits as his customers were entitled to have for moneys collected by his clerks while he was in the territory, and also left directions with his wife to turn over his books of account to the receiver, in pursuance of the order of the court, and thereupon went to Hot Springs to take the Keeley cure, where he remained until by consent of his counsel and counsel for the petitioning creditors a date was fixed for him to appear in answer to the order hereinbefore referred to. The proof shows that while he was drinking to excess during the months of September, October, and November, and doubtless, at times, was unfit to transact business, he was nevertheless, when in condition to do so, managing and conducting his own business. During that period he purchased over 400 bales of cotton, and made drafts and checks and receipts, which were used in his business transactions with the bank at Ola, and were signed by himself; and large sums of money, amounting in the aggregate to more than $5,000, were paid to his various creditors, either personally or under his directions.

Without going into details, in the opinion of the court the conduct of the bankrupt clearly establishes the fact that, when he found that he was unable to bridge over his difficulties, he determined upon feathering his own nest at the expense of his creditors. To do this and avoid detection, it was necessary for him to make away with the cotton book. This conclusion is established, in the opinion of the court, by the fact that before he left home he abstracted his books of account, his notes, and his mortgages from the safe in his store where they had been kept, and secretly concealed them at his home, permitting neither his clerks nor his counsel to know where they were

concealed, and that he has persistently refused to turn over to the receiver his cotton book, which shows the amount of cotton purchased, and the price for which it was sold, and also his check book on the Bank of Ola. His books of account, without this cotton book, have been kept in such a way as that no accountant would be able to determine the status of his business. His cash account does not balance with the books of the bank. Large sums of money came into his hands which were never deposited in the bank, and sums of money came into his hands which were never entered upon the cash book; and his books of account showed no disposition whatever of the cotton purchased, except 31 bales, or what he received for it when sold. Not a bale of this cotton was shipped to his commission merchants, and only small sums were paid to them during the season. He was sober enough to know when he returned from the territory that, before his books passed into the hands of the receiver, such sums of money as had been paid by his customers after he had concealed the books should be entered thereon, and he accordingly directed that to be done. He pretends now that he does not know why he directed this to be done; that he did not know that the books had been ordered to be turned over; that he did not know that any demand had ever been made upon him for them, or that any demand had been made upon him for his notes and mortgages. The court might place some confidence in statements of this kind if it had been shown that his wife (who was present when the order was served upon him) and his counsel and his clerks were all drunk at the same time he was; but, there being no showing of this description upon the trial, the court, being satisfied that was not the case, places no credence whatever upon the excuses which he gives for disobeying the order of the court. When his examination was closed, on the 20th of February, his pretenses and explanations were so unsatisfactory, and the matter had assumed such a serious attitude, that the court informed him he was then sober; that his books of account were accessible; that he ought to give an explanation of his business affairs, and that he should have access to his books for that purpose; that he should have an opportunity to examine his books, and appear on such a day as might be agreed upon by counsel for further examination and explanation of his business affairs. On the 27th of March, more than one month after the first examination, Mr. Wilson reappeared in court with his counsel, and underwent a second examination. At this examination he produced checks for moneys paid out by him, amounting, in the aggregate, to more than $5,000. These he had also kept from the receiver; and he insists that other checks which he had used in payment of his creditors were lost, but gives no explanation about the cotton book, which he says he was unable to find, or his check book. It appears from other testimony that the cotton book was not left in the safe when he went to the territory. He does not deny but that it was taken by him to his residence. No one has ever seen it since he took it there, so far as the proof discloses. In the opinion of the court, he still has it, or, if he has not got it, he knows where it is, and his statements to the contrary are not true. In neglecting or refusing to surrender his books of account to the receiver, and in

neglecting and refusing to obey the order of the court to appear and show cause why he should not be punished for contempt in refusing to do so, he was guilty of a contempt of court; and the order will be that he be imprisoned for the term of 30 days for his said contempt.

I now turn my attention to the second branch of the case. After the examination of the bankrupt on the 20th of February, 1902, the petitioning creditors filed a motion in this court, praying the court for an order compelling the bankrupt to pay to the trustee in bankruptcy the sum of $10,261.63 in money, and for an order directing him to surrender his cotton book and check book with the Bank of Ola. It was after this examination, upon which this petition was based, that the court indicated to the bankrupt that his books were now accessible to him, that he was sober, and that he had failed to give an account of the money which had come into his hands between the 2d of September and the 20th of November, 1901, and directed him to make an examination of his books, if he desired, and to appear before the court at a subsequent date (to be agreed upon by his counsel and the counsel upon the opposite side) to make a further showing in response to the motion above referred to. As before stated, on the 27th of March, 1902, the said Wilson did appear, and was further examined by the counsel for the petitioning creditors and his own counsel with reference to his affairs; and at the same time an expert accountant was examined, and presented to the court several statements as to what appeared upon the bankrupt's books of account, and of what appeared, also, upon the books of the Bank of Ola, with which the bankrupt did business during the period before stated. At this second examination, Wilson produced bank checks for money paid out to his customers and creditors,—for a sum of money something in excess of $5,000,—which checks he had until that time retained in his possession, and the effect of which tended to reduce the sum of money, pro tanto, which he was supposed to have in his possession. He also insisted that certain checks had been lost. How or in what way or for what amounts, he has not explained. The expert accountant shows, by explicit itemized statements showing the dates and pages of Wilson's books, that, between the 2d of September and the 20th of November, Wilson had purchased and received from his customers 426 bales of cotton, 268¼ bales of which he had paid for, in cash, $10,078.83, and on 159½ bales of which he paid $5,898.72; making, in the aggregate, $15,977.55. Wilson himself undertakes to deny that he purchased that much cotton. He admits that he did not ship any of it to his commission merchants; says that he sold it to local buyers, that he does not know their names, and cannot state what amount he sold it for; that he does not know where this cotton book is, which would show how much cotton he bought, and how much he sold it for; that he has made diligent search for his cotton book, and cannot find it, and does not know where it is. Nothing, except as stated, is shown on any of his other books of account, of this cotton, except that it appears that 159½ bales were received from his customers, and they were credited therewith in the aggregate sum of $5,898.72. It also appears that on the 2d of September he had in cash on hand in the Bank of Ola $548.21. It also appears that he

had sold merchandise for cash during the same period to the amount of $2,791.48 and had collected on bills receivable $1,445.36, and that he had received from sources other than merchandise sales, bills receivable, and amounts drawn from the Bank of Ola, the sum of $4,115.60. The bank books also show that during the same period he drew from the Bank of Ola $8,281.40, and that he had paid on sundry individual accounts $4,797.74, and had deposited in the Bank of Ola the sum of $2,047.98. From this data, obtained from his books of account, the expert furnished the court with the following statement:

Exhibit D..

Statement No. 1.

Statement of Cash Receipts and Disbursements from September 1, 1901, to November 20, 1901, as Shown by the Cash Book.

Receipts.

| | | |
|---|---|---|
| Sept. 2. | To balance on hand, as shown by cash book............ | $ 548 21 |
| | " merchandise sales, Sept. 2nd to Nov. 20, 1901......... | 2,791 48 |
| | " amt. rec'd a/c B. receivable Sept. 2 to Nov. 20, '01.... | 1,445 36 |
| | " amt. rec'd from Bank of Ola Sept. 2 to Nov. 20, '01... | 8,281 40 |
| | " " " from other sources Sept. 2 to Nov. 20, '01.. | 4,115 60 |
| | | $17,182 05 |

Disbursements.

| | | |
|---|---|---|
| Sept. 2. | By amt. paid for cotton, as per statement No. 2........ | $10,078 83 |
| | By amt. paid on sundry individual accounts, as per statement No. 3.......................................... | 4,797 74 |
| | By amt. deposited in Bank of Ola....................... | 2,047 98 |
| | | $16,924 55 |
| | Showing balance on hand, as per cash book........... | 257 50 |
| | | $17,182 05 |

It will be observed, from an examination of this statement, that it does not take into account at all the cotton received from customers for merchandise previously sold. The account itself balances, except that it shows he should have had, when the house was closed on the 20th of November, in cash, $257.50. The proof shows that at that very time Wilson was in the Indian Territory with cash in his pocket to the extent of $1,000, and that between the 20th and 29th of November between four and six hundred dollars in money had been turned over to his wife by the clerks in charge of his store. Bear in mind that none of these items are embraced in this account. The court does not regard this account as exhibiting a safe and accurate statement of Wilson's business. In the first place, it does not appear from the proof that Wilson was furnished by anybody with money with which to buy cotton during that period. He started into the season with only $548.21 on hand. The court can see, as is insisted by Wilson himself, that all of this cotton might have been purchased without the use of any considerable sum of money, if the cotton was purchased from day to day, and sold from day to day to local buyers, so that it would be unjust to charge Wilson with the $10,078.83 as the proceeds of the cotton. It would be equally unjust to credit him with the $8,281.40

which he is shown to have checked out of the Bank of Ola. In the ordinary course of business, he might have sold his cotton, and deposited the proceeds in the Bank of Ola, and immediately checked it out; and the bank's statement itself, which was exhibited, shows that, while he drew out only $8,281.40, during the same period he deposited over $13,000 in the bank. I think, therefore, in reaching any conclusion with reference to the status of the business, the purchase and sale of cotton and the deposits in the Bank of Ola must be eliminated from consideration.

The better way and the only way the court has been able to devise to reach anything like a fair and certain conclusion as to the status of the bankrupt's business at the time he was adjudicated a bankrupt may be expressed in this way: He should be charged with the following amounts:

| | |
|---|---:|
| Cash on hand Sept. 2, 1901, as shown by the cash book.......... | $ 548 21 |
| Cash receipts from merchandise sales from Sept. 2, 1901, to Nov. 20, 1901, per cash book....................................... | 2,791 48 |
| Cash collected on bills receivable for same period................ | 1,445 36 |
| Cash received from other sources than bills receivable, sales of merchandise, and Bank of Ola............................... | 4,115 60 |
| Cotton received from customers in payment of their acc'ts........ | 5,898 72 |
| | $14,799 37 |

This last item (for cotton received on account) should not be treated as cash, because it was not paid for in cash, but was collected on bills receivable; and the cotton, when collected, was sold, at what price, whether at a profit or a loss, we do not know, inasmuch as the bankrupt has made away with his cotton book. It is fair to presume that, if the book were exhibited, it would appear that he has sustained no loss in his cotton purchases and sales. He cannot, therefore, be heard to complain that he is charged with this cotton at the cash price for which he paid for it. The aggregate of these several sums amounts to $14,799.37, which is the sum with which he should be charged. He is entitled to the following credits:

| | |
|---|---:|
| Aggregate of sundry cash payments, as per cash book, from Sept 2, 1901, to Nov. 20, 1901, not including money paid for cotton... | $ 4,797 74 |
| Proceeds of 31 bales of cotton sold, and charged to his cash account ..................................................... | 1,132 44 |
| Aggregate amount paid to customers and creditors by check..... | 5,051 58 |
| The aggregate of these items amounts to.................... | $10,981 76 |

—Which, deducted from the aggregate of his debits, leaves a balance unaccounted for of $3,817.61.

It will be observed, in this statement, that the bankrupt is not charged with the profits upon cotton. He is not charged with the sums of money collected between the 20th of November and the 29th of November.

He is not charged with the sums of money which were paid into his hands, and which do not appear upon his cash book. He is credited with all the money that he is shown to have lost in futures, and with all debts that he has paid. In other words, all doubts have been resolved in his favor. The bankrupt is an intelligent and educated

man. He was not without experience. He had been engaged in business at different places for several years. He had been a man of considerable means. Would it be unjust to him to hold him accountable for moneys traced into his possession, and which are unaccounted for, under the circumstances I have narrated? If this statement of his affairs is inaccurate, it is attributable to his misconduct. If the production of the cotton book would reduce the sum, it is his fault that it is not produced. He could have but one motive in its destruction or concealment, and that was to prevent his creditors from arriving at a correct statement of his business. It was to conceal his cotton transactions. Without his cotton book, no exact statement of his affairs could possibly be reached. That any conclusion is reached upon which the court can rely cannot be attributed to anything that he has done, but, on the contrary, it has been reached in spite of his efforts to conceal the condition of his affairs.

In the case of In re Rosser, 41 C. C. A. 500, 101 Fed. 565, Judge Sanborn said:

"The effect of an adjudication in bankruptcy is to place all the property of the bankrupt not exempt by law in the custody of the district court, and to charge the bankrupt, and all other persons who have the possession or control of any of it, as trustees for the court, and for the trustee in bankruptcy who is subsequently appointed. The act of congress requires the bankrupt to 'comply with all lawful orders of the court' (section 7, subd. 2); forbids him to 'disobey any lawful order, process or writ' issued by the referee (section 41, subd. 1); subjects him to the punishment of imprisonment for a period not exceeding two years for knowingly and fraudulently concealing, while a bankrupt, or after his discharge, from his trustee, any of the property belonging to his estate in bankruptcy (section 29b); or for making a false oath or account in or in relation to any proceeding in bankruptcy (section 29b, subd. 2). There can be no doubt that under the general rules of law, and under these specific provisions of the bankrupt act, the court and the referee were vested with the right and subjected to the duty of making the necessary orders to require the bankrupt and all other persons who had the possession and control of the property of the bankrupt estate to surrender and deliver it to the trustee. Such orders constitute one of the essential means by which the court and the referee are empowered to collect the estate of the bankrupt. It is a broad and comprehensive power, and great caution should be exercised to observe its limits, and to issue under it only lawful orders. But without its lawful exercise, the administration of the estates of bankrupts would in many cases be so complicated and tedious that all the assets would be wasted in litigation, and the beneficent purpose of the bankrupt law would fail of accomplishment. Two essential facts limit this power, and condition its lawful exercise: They are that the money or property directed to be delivered to the trustee or other officer of the court is a part of the bankrupt estate, and that the bankrupt or person ordered to deliver it has it in his possession or under his control at the time that the order of delivery is made. If the property is not part of the estate, obviously no lawful order for its delivery to the trustee can be made. If the money or property in controversy was a part of the estate of the bankrupt, but before the order for its delivery is made he has squandered, disposed of, or lost it, so that it is not in his control or possession, and he cannot obtain and deliver it at the time the order of delivery is made, or within a reasonable time thereafter, it cannot be a lawful order, because the court may not order one to do an impossibility, and then punish him for refusal to perform it. The punishment of the bankrupt for such acts must be sought under the provisions of the bankrupt law relative to the fraudulent concealment of the property of the estate, and the making of false oaths relative thereto. But if it appears to the satisfaction of the referee or the court that property of the

bankrupt estate is in the control or possession of the bankrupt, a lawful order for its delivery to the trustee may be made; and a refusal to obey this order may be punished as a contempt of court, both ·under the general law relative to contempts, and under the specific provisions of the bankrupt act."

In view of the fact that no order should be made to pay over unless the court is satisfied that the property is in the possession or under the control of the bankrupt, I have given this case the most thorough and careful consideration, and have familiarized myself with the testimony as thoroughly as I am capable of; and I have reached the conclusion that the bankrupt has in his possession or under his control the amount of money I have just stated (i. e., $3,817.61), and, I incline to think, considerably more. I am satisfied that the money which he has received, and which was not credited to his cash account,—the amounts which were paid over to his wife after he left and went to the territory, in view of the fact that she could go to the store and get whatever she desired to live upon,—not to mention profits on cotton, was amply sufficient to cover any legitimate expenses to which he has been put. And some of the courts have held (and I think righteously) that for illegitimate expenses—gambling and traveling expenses, and the like —he cannot be allowed. In re Tudor (D. C.) 4 Am. Bankr. R. 78, 100 Fed. 796; Knitting Works v. Schreiber (D. C.) 4 Am. Bankr. R. 299, 101 Fed. 810; In re Durham (D. C.) 4 Am. Bankr. R. 760, 104 Fed. 231. The method which has been employed in reaching the result above stated is fully sustained by authority. Knitting Works v. Schreiber (D. C.) 4 Am. Bankr. R. 299, 101 Fed. 810.

Taking the most charitable view of this evidence which can justly and fairly be done, and making every possible allowance for the bankrupt's drunkenness and dissipation, I reach the conclusion, and so find, that he has wholly failed to account for, and now has in his possession and under his control, the sum of $3,817.61, which he has failed to schedule or turn over to the trustee in bankruptcy. It is therefore ordered that the said bankrupt turn over and deliver to the trustee within 10 days the said sum of $3,817.61, in default of which he stand committed to the marshal of this district, to be incarcerated until he obeys the order of this court, or is otherwise discharged by due process of law, or until the further order of this court.